### NEW YORK LIFE INSURANCE COMPANY v. ANDREW SCOTT, ADMINISTRATOR.

#### Decided May 12, 1900.

**Life Insurance—Forfeiture—Waiver.**

A life insurance policy having lapsed by failure of insured to pay a quarterly premium, the next succeeding premium was remitted by him on receipt of notice that it was due; he was then notified of the forfeiture and of the terms of reinstatement— by remitting the unpaid installment and sending health certificate; he sent the payment but not the certificate; the insurer collected his checks sent for the two payments, placing the amount to his credit in a "suspense account," to be returned if he failed to send health certificate; with the matter standing thus, insured died. Held, that there was no waiver of the forfeiture, and in a suit on the policy the court should have directed a verdict for defendant.

APPEAL from Parker. Tried below before D. M. ALEXANDER, Esq., Special Judge.

*Crane & Greer,* for appellant.

*Martin & Martin,* and *Albert Stevenson,* for appellee.

HUNTER, ASSOCIATE JUSTICE.—This suit was filed in the District Court of Parker County on the 9th day of February, 1897, by Andrew Scott, the appellee, as administrator of the estate of William P. Callison, deceased, to recover judgment on a policy of life insurance issued by the appellant company on the 24th day of March, 1894, for the sum of $2000, and for interest, statutory penalty, and reasonable attorney's fees, as allowed by our statutes in such cases, for refusing to pay the loss. Callison died on the 3d day of November, 1895.

The appellant company answered by a general denial, and specially that the policy had lapsed and was forfeited by failure to pay the quarterly premium due thereon June 24, 1895, of $10.50. The reply to this was that no notice, as required by the policy, was given deceased to pay said June premium, and that the company had also waived the forfeiture, if any, by accepting the June and September premiums.

The case was tried by a jury on the 7th day of November, 1899, who

found a verdict against the company for $2463, upon which judgment was rendered and from which this appeal is taken.

The evidence was sufficient to entitle the administrator to recover, unless the deceased, Callison, had forfeited his policy by failing to pay the June premium of 1895, or if the company had waived the forfeiture he was entitled to recover.

We find that on June 24, 1895, a quarterly premium on said policy became due. On May 14, 1895, a printed notice was addressed to deceased at Mineral Wells, Texas, where he resided, and duly stamped and deposited in the United States postoffice at Dallas, Texas, by the company's general agent, informing the assured that his quarterly premium of $10.50 would fall due on June 24, 1895. Said notice fully complied in all respects with section 92 of chapter 690 of the statutes of the State of New York passed in 1892, which laws formed a part of the contract of insurance by the terms of said policy. The depositing of this notice in the postoffice, by the terms of the statute aforesaid, operated as full notice to the assured of its contents, whether he ever received it or not. The quarterly premium due June 24, 1895, was not remitted to the company until October 26, 1895. The policy, however, gave the assured thirty days' grace on the payment.

The company also gave the assured due and full notice of the maturity of the quarterly premium due September 24, 1895, in the same manner as it did the June premium, and on September 23, 1895, the assured sent a check on a bank at Mineral Wells to the company's general agent for the State at Dallas, Texas, inclosed in the following letter:

"MINERAL WELLS, TEXAS, Sept. 23, 1895.
"Mr. R. H. Mitchell, Cashier, Dallas, Texas:
"Dear Sir.—Inclosed find check for $10.50, that being the amount due on my policy No. 598,333. Yours truly,
"W. P. CALLISON."

On receipt of this letter Mitchell entered the amount of the check to the credit of Callison in what he called the "suspense account," which contained moneys thus sent him, but which he held for the remitters conditionally only, or in this instance until the assured should send him a health certificate, and it was accepted by the medical department of the company in New York, and returned the following answer:

"DALLAS, TEXAS, Sept. 25, 1895.
"W. P. Callison, Esq., Mineral Wells, Texas:
"Dear Sir.—I am in receipt of yours of the 23d inst. inclosing check for $10.50, which you state is the amount due on your policy No. 598,333. According to our record you failed to pay the June quarterly premium on this policy; consequently same lapsed for nonpayment of this premium. It is therefore necessary that you have the inclosed health certificate filled out at your own expense by our Dr. C. B. Rains of your city.

Upon receipt of this certificate properly filled out, together with $10.65, the amount of the September premium and interest on the past due June premium, I will be pleased to submit the certificate to our medical board, and if same is approved by them, I will duly forward you the official receipt of the company. Yours truly,

"R. H. MITCHELL, Cashier."

On October 25, 1895, the assured answered this letter as follows:

"MINERAL WELLS, TEX., 10/25/95.
"Mr. R. H. Mitchell, Cashier, Dallas, Texas:
"Dear Sir.—I received your letter some time ago saying I had not paid my June premium. Now, I think I have, for I received your notice September of that one; though, of course, if you received my check, your books will show it. If I did it was an oversight of mine, and I will inclose you a check to-day for $10.75, as I don't want to forfeit my policy, and yet I don't think I ought to have to pay Dr. Rains to examine me.
"Hoping this is satisfactory, I am yours truly,

"W. P. CALLISON."

On October 26, 1895, this letter was replied to as follows:

"DALLAS, TEX., Oct. 26, 1895.
"W. P. Callison, Esq., Minerel Wells, Texas:
"Dear Sir.—I am in receipt of yours of the 25th inclosing check for $10.75, to cover the September premium on your life insurance policy No. 598,333. As I wrote you before, this policy lapsed for nonpayment of the June premium, and before we can report the amount which we have received from you on account of June and September premiums, it will be necessary that you furnish us with the certificate requested in my previous letter. I inclose you another blank certificate to have filled out. Yours truly,

"R. H. MITCHELL, Cashier."

No response was ever made to this letter, but on November 3, 1895, Mr. Callison died at Mineral Wells, with typhoid fever, he having been confined to his bed with it for about twenty-one days prior to his death. No health certificate was ever furnished the company.

The last check received by Mitchell was placed in the "suspense account" to the credit of Mr. Callison and collected, as was the previous one. The amount collected on these checks was deposited in a bank at Dallas, Texas, by Mr. Mitchell, to the general credit of the appellant company, and the "suspense account" was kept in his own office between his company and its patrons, and could be drawn against by him to refund sums paid by parties in arrears on premiums, if not reinstated. As soon as Mr. Mitchell heard of the death of Mr. Callison, he set about to find out who his personal representatives were, in order to return the June

and September premiums held by him in suspense account, and after some correspondence with his uncle, R. L. Scott, he sent the amount in a check to appellee's attorney at Mineral Wells, who returned it, refusing to receive it, and notifying Mitchell that he was employed to bring suit upon the policy. This sum of $21.25 is tendered back in the pleadings.

The first assignment of error complains of the court's refusal to instruct the jury to find a verdict for appellant, and we think must be sustained. The evidence is undisputed that the notice of the maturity of the June premium and amount and place of payment, and that forfeiture of the policy would ensue if it was not paid on the day named, was given according to the law of the contract, and it is also undisputed that that premium was not offered to the company until October 26, 1895, more than four months after it became due, and more than three months after the last day of the thirty days' grace allowed by the contract where the policy had been in force for three months, as this one had been.

Appellee insists, however, that the company had waived the forfeiture, or at all events its conduct had been such as to lead the assured to believe it had waived it; and to sustain these propositions he shows that the general agent gave the assured notice of the maturity of the September premium and received it, and later the June premium, and cashed both checks and placed the money to the general credit of his company in its bank at Dallas.

It is true the general agent collected the checks promptly as they were received, but it is also true and undisputed that he kept the amounts, as between himself and his company, in the "suspense account," where he could draw against his company for the amount in favor of Mr. Callison, if he should ultimately fail or refuse to send him the health certificate required, and also on each occasion of the acknowledgment of the receipt of the checks for these premiums plainly notified the assured that he must furnish a health certificate in order to reinstate his policy. The other evidence upon which the waiver is claimed is all in writing and contained in the record, and consists of the letters above quoted, and it is too plain for discussion that in all of them the agent insisted that it was *necessary* to send him the health certificate before he would accept the premiums and forward them to the company and reinstate the lapsed policy, and sent him twice blank health certificates to be filled out by the company's physician at Mineral Wells. It is impossible to conceive that Mr. Callison was deceived or misled by the conduct or letters of the agent into the belief that he had waived the forfeiture. Every letter plainly expressed the contrary; that is, in effect, that the policy would not be reinstated unless the health certificate was duly made and returned and approved by the health board of the company in New York.

In his letter of the 28th of September the agent informs him that his policy is lapsed for nonpayment of the June premium, and in effect,

that it will be necessary to have the inclosed health certificate filled out by the doctor and returned before it could be reinstated. But he neglected to do so, and in less than two weeks he was stricken down with typhoid fever, and from that day to the day of his death he could not have procured a certificate of good health, though on the 26th of October, only a week before his death and while on his deathbed, he sent the June premium and interest, but declined to send the health certificate, because, as he expressed it, he "did not think he ought to pay Dr. Rains to examine him." This conclusively shows that he knew and understood that a health certificate was required of him in order to reinstate the policy, and he must as certainly have known and understood that no honorable physician would make it in his then condition, and hence he made no effort to obtain it.

The evidence of forfeiture being uncontradicted, and there being absolutely no legal evidence of a waiver of the forfeiture, the court should have instructed a verdict for the defendant, and in such cases, though tried by a jury, it becomes our duty to reverse this judgment and render one in favor of the appellant company, which we accordingly order.

*Reversed and rendered.*

Stephens, Associate Justice, did not sit in this case.

Writ of error refused.